# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| AZIZ SALAAM, | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| P/O TRAVIS WOLFE, *et al.*, | : | No. 14-2055 |
| Defendants. | : | |

## MEMORANDUM

**Schiller, J.**                                                                                                                                 **August 19, 2019**

In the early-morning hours of June 5, 2012, the Philadelphia police radio broadcasted reports of a car accident and shots fired at police. When Officer Barry Delagol responded to the scene, he spotted Aziz Salaam holding a gun and followed him into an alleyway. Officer Travis Wolfe also responded to the scene and pursued Salaam through the alleyway. Although Salaam eventually stopped, he did not drop his gun or wait for instructions. Instead, he raised his arms and turned toward police with his gun-holding hand. Fearing for their safety, Delagol and Wolfe each shot Salaam.

Salaam sued Delagol and Wolfe under 42 U.S.C. § 1983 for excessive force in violation of the Fourth and Fourteenth Amendments. He also asserted state law claims for battery, intentional infliction of emotional distress, and negligent infliction of emotional distress. Delagol and Wolfe moved for summary judgment. Because the Court concludes that Delagol and Wolfe acted reasonably, the Court grants their motion.

## I. BACKGROUND[1]

In the evening prior to the shooting, Salaam smoked PCP. (Aziz Salaam Dep. at 88, June 18, 2019 [Salaam Dep.].) Later, in the early-morning hours, he drove around—without a valid driver's license—to "[s]ee who was out, still chasing." (*Id.* at 85, 96.) He brought a handgun despite his prior criminal convictions making the possession unlawful. (*Id.* at 110-12.)

When Salaam approached the intersection of 10th and Norris Streets, he rear-ended another car that pulled out from a parallel parking spot. (*Id.* at 97.) The airbags deployed, hitting Salaam's eye and somewhat impairing his vision. (*Id.* at 105, 110. *But see id.* at 106, 108 (describing post-accident visual observations).) After the crash, the other car turned left onto 10th Street while Salaam continued driving westbound on Norris Street until his car died at the intersection of Norris and Alder Streets. (*Id.* at 101-04.)

Then, the driver of the other car, Jamar McRae, parked next to Salaam, got out of the car, and yelled at him. (*Id.* at 104-08; Pl.'s Resp. to Defs.' Statement of Undisputed Facts ¶ 20 [Pl.'s Resp. to Defs.' SUF].) Around that time, at least two Temple security guards arrived on bicycles. (Pl.'s Resp. to Defs.' SUF ¶ 21.) Also around that time, Salaam heard a popping noise. (Salaam Dep. at 109-10.)

According to Salam, he suspected that McRae purposefully caused the accident. (*Id.* at 104.) Salaam testified that although he did not see McRae holding a weapon, Salaam believed he was under attack. (*Id.* at 110; Pl.'s Resp. to Defs.' SUF ¶ 15.)

Salaam exited his car, pulled out his gun, and fired ten shots in the air to scare potential attackers. (Salaam Dep. at 105, 113-15.) McRae and the security guards ran away when Salaam started shooting. (Pl.'s Resp. to Defs.' SUF ¶ 22.)

---

[1] The following facts are based on the record evidence, viewed in the light most favorable to Salaam, the nonmoving party.

Meanwhile, Philadelphia police responded to the scene. Some officers dispatched in response to the car accident. (Defs.' Mot. for Summ. J., Ex. G at CD 2 Folder, Track 6 [Radio].) More officers dispatched when the police radio broadcasted, "Assist Temple Police. Shots fired at police. . . . Shots fired at Temple Police." (Radio, CD 2 Folder, Track 21.)

The responding officers included Delagol, Wolfe, and Eyleen Archie. Delagol and Wolfe each testified that they believed police officers were under fire. (Barry Delagol Dep. at 123, June 20, 2019 [Delagol Dep.]; Travis Wolfe Dep. at 65, July 9, 2019 [Wolfe Dep.].) When Delagol approached the area, he observed Temple police bent behind patrol cars and reasoned that they were taking cover. (Delagol Dep. at 142-43.) Moreover, Officer Archie heard gun shots when she approached the area. (Eyleen Archie Dep. at 14, July 9, 2019 [Archie Dep.].)

Upon their arrival, Delagol and Archie observed Salaam holding a gun and walking away from the accident. (Delagol Dep. at 96-99; Archie Dep. at 19-20.) They each followed him. (Delagol Dep. at 99-100; Archie Dep. at 19-20.) Wolfe did not see Salaam upon arrival, but he saw other officers running into an alleyway. (Wolfe Dep. at 31-32.) Wolfe followed the officers and then observed Salaam holding the gun. (*Id.* at 33-34.)

Delagol and Wolfe testified that they yelled at Salaam during the pursuit. (Delagol Dep. at 99-100, 109; Wolfe Dep. at 33, 40.) In fact, police radio recorded Delagol, whose call sign is K3, screaming, "K3 – Drop the gun!" (Radio, CD2 Folder, Track 21; Delagol Dep. at 141-42.) Yet Salaam did not hear anyone yelling. (Salaam Dep. at 120-21.)

After Salaam entered the alleyway, he made two left turns. (Pl.'s Resp. to Defs.' SUF ¶¶ 42-43.) Eventually, Salaam heard someone command him to stop. (Salaam Dep. at 122-23.) Believing that police officers made the command, Salaam stopped and placed his hands above his head with the gun in his right hand. (*Id.* at 124.) Before receiving any other instructions or

commands, he turned to his right side "to see what was going on . . . [and] to figure out where . . . [the police] even c[a]me from." (*Id.* at 125-26.)

As Salaam turned, Delagol and Wolfe began shooting at him. Delagol fired four shots and Wolfe fired four or five shots. (Defs.' Mot. for Summ. J., Ex. I at D75 [Police Shooting Report]; Wolfe Dep. at 45.) All three officers believed that Salaam intended to fire at them. (Delagol Dep. at 115, 143; Wolfe Dep. at 66-67; Archie Dep. at 38-39.)

In total, Salaam testified that he was shot seven times: once or twice while standing and at least four more times while on the ground. (Salaam Dep. at 127, 131-34.) According to Salaam, he dropped the gun after the first shot hit him. (*Id.* at 129.) But the shooting happened very quickly, and Salaam fell next to his gun. (Delagol Dep. at 125.) Salaam testified that Delagol and Wolfe seemed to fire as fast as they could, back to back. (Salaam Dep. at 128-29.)

Salaam sued Delagol and Wolfe for excessive force, battery, intentional infliction of emotional distress, and negligent infliction of emotional distress. The Court now grants Delagol and Wolfe's motion for summary judgment.

## II. STANDARD OF REVIEW

Summary judgment is appropriate when the admissible evidence fails to demonstrate a genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A factual dispute is genuine if "a reasonable jury could return a verdict for the nonmoving party," and it is material if, under substantive law, it "might affect the outcome of the suit." *Id.* at 248.

When the nonmoving party bears the burden of proof, "the party moving for summary judgment may satisfy Rule 56's burden" by "submit[ting] affirmative evidence that negates an essential element of the nonmoving party's claim" or "demonstrat[ing] . . . that the nonmoving

4

party's evidence is insufficient to establish an essential element of the nonmoving party's claim." *Celotex Corp. v. Catrett*, 477 U.S. 317, 331 (1986).

When considering a motion for summary judgment, a court must view the evidence in a light most favorable to the nonmovant and draw all reasonable inferences in the nonmovant's favor. *Anderson*, 477 U.S. at 255. The court may not, however, make credibility determinations or weigh the evidence in considering motions for summary judgment. *Boyle v. Cnty. of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1998).

### III. DISCUSSION

#### A. Salaam's Fourteenth Amendment claim is dismissed because excessive force during the arrest is governed by the Fourth Amendment.

The Court will dismiss Salaam's Fourteenth Amendment claim because that Amendment does not apply to Delagol and Wolfe's force during the arrest. The amendment that applies to an excessive force claim depends on "where the [plaintiff] finds himself in the criminal justice system." *Estate of Booker v. Gomez*, 745 F.3d 405, 419 (10th Cir. 2014). "[I]f a constitutional claim is covered by a specific constitutional provision, . . . the claim must be analyzed under the standard appropriate to that specific provision . . . ." *United States v. Lanier*, 520 U.S. 259, 272 n.7 (1997).

Salaam's claim is governed by the Fourth Amendment—not the Fourteenth Amendment. As the Supreme Court made clear, the Fourth Amendment's reasonableness standard governs claims of excessive force "in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen." *Graham v. Connor*, 490 U.S. 386, 395 (1989); *c.f. DeGroat v. Cavallaro*, Civ. A. No. 16-1186, 2017 WL 2152376, at *3 (M.D. Pa. May 17, 2017) (concluding that shootings constitute seizures under the Fourth Amendment). Because Salaam's excessive force claim arose from an

5

arrest or seizure, the Fourth Amendment applies. Thus, Delagol and Wolfe are entitled to summary judgment on Salaam's Fourteenth Amendment claim.

### B. Salaam's Fourth Amendment claim is dismissed because Delagol and Wolfe acted reasonably when they used deadly force.

Salaam alleges that Delagol and Wolfe used excessive force against him and therefore infringed on his Fourth Amendment right to be free from unreasonable seizure. Delagol and Wolfe disagree, arguing that qualified immunity shields them from liability.

Qualified immunity protects government officials performing discretionary functions "as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton*, 483 U.S. 635, 638 (1987). A qualified-immunity analysis requires a court to ask two questions: (1) "taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" and, if so, (2) was the right clearly established at the time of the violation? *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

Excessive force claims against law enforcement officers are determined by the Fourth Amendment's reasonableness standard. *Graham*, 490 U.S. at 395. The decision "requires careful attention to the facts and circumstances of each particular case." *Id.* Factors that guide the decision include (1) the severity of the crime, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect actively resisted arrest or attempted to evade arrest by flight. *Id*; *c.f. George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013) ("The most important factor . . . is whether the suspect posed an immediate threat to the safety of the officers or others."). Furthermore, the decision must also account for the "tense, uncertain, and rapidly evolving" nature of police work that calls for "split-second judgments." *Graham*, 490 U.S. at 397.

Under this standard, officers may use deadly force if they have "good reason 'to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others.'" *Lamont v. New Jersey*, 637 F.3d 177, 183 (3d Cir. 2011) (quoting *Tennessee v. Garner*, 471 U.S. 1, 3 (1985)). They may even employ such force before seeing a suspect's weapon. *Thompson v. Hubbard*, 257 F.3d 896, 899 (8th Cir. 2001). Even if officers use deadly force "in the mistaken belief that a suspect is armed," other circumstances may justify the force. *Lamont*, 637 F.3d at 183.

Police officers are entitled to use force "until a suspect thought to be armed is 'fully secured.'" *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 821 (11th Cir. 2010). Even when a suspect ostensibly surrenders, police officers might reasonably question the suspect's sincerity based on earlier actions. *Id.* at 822.

Here, considering the facts in a light most favorable to Salaam, no reasonable jury could find that Delagol and Wolfe acted unreasonably. Given the circumstances at the time, Delagol and Wolfe could have reasonably interpreted Salaam's movement as an escalated threat. Although Salaam argues that Delagol and Wolfe did not witness him shooting or confirm that he was their suspect, officers are not prohibited from relying on strong circumstantial evidence. Delagol and Wolfe responded to an incident involving shots fired at police. They observed Salaam holding a gun at an active-shooter scene and pursued him through an alley at an early-morning hour. When Salaam stopped, he raised his hands but he failed to comply with Delagol's order to drop the weapon. Instead, Salaam began turning toward the officers in the direction of his gun-holding hand. Before Salaam completed the turn or pointed his gun at them, Delagol and Wolfe shot him. Although Salaam says he never heard any commands to drop the gun, the officers could reasonably believe that Salaam ignored them. They acted reasonably by deciding not to risk fire from an active

7

shooter. *See Lamont*, 637 F.3d at 183 ("Police officers do not enter into a suicide pact when they take an oath to uphold the Constitution.").

Even if Delagol and Wolfe fired shots at Salaam after he fell, they acted reasonably. Salaam argues that their force became unreasonable when he fell and they continued to shoot. Salaam relies on *Lamont*, a Third Circuit case holding that the continued use of force might become excessive, even if initially justified. 637 F.3d at 184. In *Lamont*, the officers justifiably shot a suspect when he yanked his hand out of his waistband. *Id.* But after the suspect's "weaponless right hand was fully visible . . . the troopers continued to fire for roughly 10 seconds, shooting a total of 39 rounds." *Id.* Under those facts, "a jury could find that the troopers should have realized that [the suspect] did not have a weapon some time thereafter and ceased fire." *Id.* Other cases have relied on *Lamont* to find that initially justified deadly force might become unreasonable. *See, e.g.*, *Rodriguez v. City of New Brunswick*, Civ. A. No. 12-4722, 2017 WL 6442097 (D.N.J. Dec. 18, 2017). In *Rodriguez*, after a detective justifiably fired three shots at a suspect, the suspect fell to the ground with his arms extended and his blank gun tumbled ten to fifteen feet away. *Id.* at *3. Three seconds after the detective fired his third shot and the suspect hit the ground, another officer fired a fourth shot that hit the suspect. *Id.* at *4, *15. The detective had already re-holstered his weapon, apparently concluding that he had neutralized the threat. *Id.* at *11. Because circumstances significantly changed by the time the officer fired a fourth shot, a jury could have concluded that the officer violated the suspect's rights by shooting him a fourth time. *Id.* at *15-*16.

Salaam's case is different. Unlike the troopers in *Lamont*, Delagol and Wolfe actually observed the suspect's gun. And unlike *Rodriguez*, Salaam fell next to his gun. When Salaam fell next to his gun, a reasonable officer could conclude that he still posed a threat as an unsecured,

8

active-shooter suspect. Despite that possibility, Delagol and Wolfe stopped firing almost immediately after Salaam fell to the ground, which also distinguishes Salaam's case from *Rodriguez*. Salaam testified that they fired the shots "back to back," without pausing. In other words, they had no time to reassess Salaam's threat before circumstances changed and they stopped firing. *See Stevens-Rucker v. City of Columbus*, 739 F. App'x 834, 844 (6th Cir. 2018) (concluding that shots fired in "rapid succession . . . constituted a single event" and the officer did not have enough time to "reassess the threat level between the shots").

Because the Court finds that Delagol and Wolfe used objectively reasonable force, they are entitled to summary judgment on Salaam's Fourth Amendment claim.

### C. Salaam's state law claims are dismissed because Delagol and Wolfe never committed willful misconduct.

Delagol and Wolfe argue that Salaam's state law claims are barred by Pennsylvania's Political Subdivision Tort Claims Act ("PSTCA") because they did not commit willful misconduct. The PSTCA immunizes government employees from liability for personal injuries caused while acting in the scope of employment. 42 Pa. Stat. and Cons. Stat. Ann. §§ 8541, 8545. But it contains an exception for employees who commit "a crime, actual fraud, actual malice or willful misconduct." *Id.* at § 8550. Although willful misconduct is generally "synonymous with the term 'intentional tort,'" a different standard applies to police officers. *See Renk v. City of Pittsburgh*, 641 A.2d 289, 293 (Pa. 1994) (concluding that an officer's action did not constitute willful misconduct despite a jury verdict in a civil action against the officer for assault, battery, and false imprisonment). They "must *intend to commit* the intentional tort." *Brummell v. City of Harrisburg*, Civ. A. No. 09-1816, 2010 WL 3896382, at *3 (M.D. Pa. Sept. 30, 2010).

Here, Salaam concedes that the willful misconduct exception is foreclosed if Delagol and Wolfe are entitled to qualified immunity. In any event, Salaam's battery and intentional infliction

9

of emotional distress claims fail: he did not offer any evidence showing that Delagol and Wolfe intended to violate his rights. His negligent infliction of emotional distress claim also fails. *See Dashner v. Riedy*, Civ. A. No. 99-2124, 2004 WL 203193, at *8 (E.D. Pa. Jan. 28, 2004) ("The allegation of negligence inherent in a claim for negligent infliction of emotional distress contradicts the willful misconduct required to defeat the state's grant of immunity to its officials or subdivisions."). Therefore, the Court will grant summary judgment in favor of Delagol and Wolfe on Salaam's state law claims.

## IV. CONCLUSION

For these reasons, the Court grants Delagol and Wolfe's motion for summary judgment. An appropriate Order will be docketed separately.